**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X     **Case No.**

LATTINA BROWN,

                          Plaintiff,                    **COMPLAINT**

       - against -

                                          **PLAINTIFF DEMANDS**

THE CITY OF NEW YORK, and BRIAN ADAMS     **A TRIAL BY JURY**
*individually*,

                        Defendants.

-----------------------------------------------------------------------X

       LATTINA BROWN ("Plaintiff"), by and through her attorneys, PHILLIPS & ASSOCIATES, PLLC, against THE CITY OF NEW YORK and BRIAN ADAMS (collectively "Defendants"), alleges upon knowledge as to herself and her own actions and upon information and belief as to all other matters as follows:

### NATURE OF THE CASE

1.     Plaintiff complains pursuant to the discrimination and retaliation provisions of (i) **Title VII of the Civil Rights Act of 1964**, as amended, 42 U.S.C. § 2000e, *et. seq.* ("Title VII"); (ii) the **New York State Human Rights Law**, New York State Executive Law, § 296 *et seq.* ("NYSHRL"); (iii) the **New York City Human Rights Law,** New York City Administrative Code § 8-107(1), et seq. ("NYCHRL"), and any other claim(s) that can be inferred from the facts set forth herein. Plaintiff seeks damages to redress the injuries Plaintiff suffered as a result of being discriminated against and retaliated against by Defendants on the **basis of Plaintiff's sex (female) by way of sexual harassment**.

### JURISDICTION AND VENUE

2.     Jurisdiction of this Court is proper under 42 U.S.C. §12101, et seq., and 28 U.S.C. §§ 1331 and 1343.

3.  The Court has supplemental jurisdiction over Plaintiff's state and county claims pursuant to 28 U.S.C. § 1367.

4.  Venue is proper in this district in that the events or omissions giving rise to the claims occurred within the Southern District of New York. 28 U.S.C. § 1391(b).

## PROCEDURAL PREREQUISITES

5.  Plaintiff timely filed a complaint, upon which this Complaint is based, with the United States Equal Employment Opportunity Commission ("EEOC").

6.  Plaintiff received a Notice of Right to Sue from the EEOC dated December 20, 2023 with respect to the instant charges of discrimination. A copy of the Notice is annexed to this Complaint.

7.  This action is being commenced within 90 days of receipt of the Notice of Right to Sue.

## PARTIES

8.  Plaintiff is a female and a resident of the State of New York.

9.  At all times material, Plaintiff was and is a "person" and an "employee" of Defendants and entitled to protection as defined by TITLE VII, NYSHRL, and NYCHRL.

10. At all times material, THE CITY OF NEW YORK ("Defendant NYC") owns, funds, operates and maintains the New York City Police Department ("NYPD").

11. At all times material, The NYPD is a New York City Agency located at 1 Police Plaza, New York, New York 10038.

12. At all times material, The NYPD operates, funds, and maintains the NYPD Community Affairs Bureau ("NYPD CAB").

13. At all times material, Brian Adams ("Defendant Adams"), Director of the Community Ambassador Program for the Community Affairs Bureau, was employed by Defendant NYC

as a Supervisor. In Defendant Adams' role with Defendant NYC, he directly supervised certain employees, including Plaintiff. Additionally, Defendant Adams had the authority to affect the terms and conditions of Plaintiff's employment.

14.    At all times material, Plaintiff was an employee of Defendant NYC.

15.    At all times material, Defendant NYC "employs" fifteen or more "employees," and are thus an "employer" within the meaning of Title VII, the NYSHRL and the NYCHRL.

## **MATERIAL FACTS**

16.    On or about June 6, 2022, Plaintiff began working for Defendant NYC as a Full-Time NYPD Citywide Community Coordinator, earning approximately $70,000 annually.

17.    Police Commissioner Edward Caban, who at the time, was a Deputy Commissioner ("Commissioner Caban"), helped Plaintiff obtain this position.  Commissioner Caban told Plaintiff, upon her higher, to "come to him" should Plaintiff face any issues.  However, as discussed below, Commissioner Caban failed to live up to that promise.

18.    At all times material, Plaintiff typically worked approximately 35 hours a week.

19.    At all times material, Plaintiff was qualified for her position.

20.    Through Plaintiff's employment, Defendant Adams was Plaintiff's Direct Supervisor.

21.    Plaintiff was an exemplary employee with no write-ups or history of formal discipline throughout her employment.

22.    Upon commencement of her employment Defendant NYC, Plaintiff was directed to have a seat in Defendant Adams' office.  However, as she was approaching the office, she overheard Defendant Adams tell a colleague, "[h]er ass will not be sitting in my office, this is my office, I do not care where she sits."

23.    As a result, Plaintiff was left without a desk or a phone by Defendant Adams for the first two

weeks of her employment.  Nonetheless, Defendant Adams gave her assignments, which he expected her to complete.

24.    On or about June 8, 2022, Defendant Adams asked Plaintiff to accompany Defendant Adams to a meeting with Brooklyn Borough President Antonio Reynoso ("Mr. Reynoso") and Deputy Commissioner Mark Stewart ("Mr. Stewart"). Plaintiff did not understand what her purpose at the meeting would be, but nevertheless acquiesced to Defendant Adams' request.

25.    As such, that same day, Defendant Adams and Plaintiff took an unmarked car to Mr. Reynoso's office. While stepping out of the car, a woman approached Plaintiff and complimented Plaintiff by saying, "you are very beautiful, and I love your dress." In response Defendant Adams told Plaintiff, "That woman wasn't trying to compliment you, she wants to sleep with you. You have women checking you out because you look good." Plaintiff was shocked and offended by Defendant Adams' crude and demeaning statement.

26.    After the meeting, Plaintiff and Defendant Adams returned to the car whereupon he asked Plaintiff if she was married and if she was "horny." Plaintiff immediately felt concerned for her safety and felt traumatic flashbacks to a previous sexual assault she suffered. Extremely anxious and uncomfortable, Plaintiff did not reply to Defendant Adams. Instead, she sat silently in the car waiting to return to the office.

27.    Later that day, in the evening, Plaintiff called Commissioner Caban in an effort to report Defendant Adams' sexual harassment, but he did not answer Plaintiff's call.

28.    The following day, Plaintiff made another attempt to contact Commissioner Caban, which was successful. In speaking with Commissioner Caban, Plaintiff complained that Defendant Adams made sexually inappropriate comments to her and she no longer felt comfortable working with him.

29.   Commissioner Caban responded, in sum and substance, that he did not want to get involved and that Plaintiff should go through the proper channels to report Defendant Adam's behavior. Commissioner Caban took no further action after learning Defendant Adams sexually harassed Plaintiff.

30.   Commissioner Caban failed to report or escalate Plaintiff's complaint and did nothing to correct or prevent Defendant Adams from continuing to sexually harass Plaintiff.

31.   Instead, even though Plaintiff continued to regularly contact Commissioner Caban regarding Defendant Adams' sexual harassment through July 2022, Commissioner Caban cut off all communication with Plaintiff.

32.   Unobstructed by any response by Commissioner Caban to Plaintiff's complaint, Defendant Adams continued to harass Plaintiff.

33.   For example, Defendant Adams would regularly call Plaintiff into his office and direct her to sit down while he performed work completely unrelated to Plaintiff's presence in his office. If Defendant Adams deigned to even speak with Plaintiff at all he would discuss unrelated to work. Nonetheless, Defendant Adams denied Plaintiff permission to leave until he dismissed her.

34.   On or about June 21, 2022, Defendant Adams approached Plaintiff's cubicle and sat on Plaintiff's desk with his legs spread open displaying his erect penis through his pants.

35.   Upon information and belief, Defendant Adams noticed Officer Daniel Moussanef ("Officer Moussanef") observe the interaction and Plaintiff's discomfort. As a result, Defendant Adams abruptly walked away from Plaintiff's desk to avoid any consequences stemming from the sexual harassment he presumed Officer Moussanef observed.

36.   Due to Plaintiff's clearly terrified demeanor, Officer Moussanef escorted Plaintiff outside for

air. Once outside, Plaintiff informed Officer Moussanef of the ongoing sexual harassment Plaintiff had been subjected to by Defendant Adams.

37.    Although Plaintiff expressed fear of possible retaliation upon doing so, Officer Moussanef nonetheless urged Plaintiff to file a complaint right away regarding Defendant Adams' conduct.

38.    In the days that followed, Defendant Adams observed Plaintiff cordially interacting with male officers, leading him to target and belittle Plaintiff in the office.

39.    For example, various officers brought it to Plaintiff's attention that they recognized Plaintiff from her campaign for City Council. Thereafter, Defendant Adams would regularly interrupt conversations between Plaintiff and NYPD CAB Officers, raising his voice at Plaintiff and calling Plaintiff his "secretary" in front of the Officers. On account of Defendant Adams' pronouncements, some of the Officers thereafter began to erroneously refer to Plaintiff as Defendant Adams' secretary.

40.    On or about June 29, 2022, Plaintiff's colleague, Police Administrative Aide, Arianna Dillion ("Ms. Dillion"), asked to speak with Plaintiff outside. Ms. Dillion looked distressed, so Plaintiff offered to have lunch with her.

41.    During their lunch, Ms. Dillion explained that Defendant Adams had approached Ms. Dillion's cubicle, sat on the desk with his legs spread, and displayed his erect penis through his pants. Ms. Dillion further confessed that she felt relieved that since Plaintiff's hire, Defendant Adams' sexually inappropriate behavior and unwanted attention shifted from her to Plaintiff.

42.    Later that same day, on or about June 29, 2022, after Plaintiff returned from lunch with Ms. Dillion, Defendant Adams again called Plaintiff into his office and questioned Plaintiff's

6

education stating, "I heard you went to John Jay college for your master's degree." Plaintiff replied that was not correct.

43.     Nonetheless, Defendant Adams began to gloat about his education at length. Defendant Adams further made a point to inform Plaintiff that he is related to Mayor Eric Adams and City Council Speaker Adrienne Adams. Plaintiff was uncomfortable with the situation and, seeing as Defendant Adams had no intention of speaking regarding anything work-related, Plaintiff asked to be excused.

44.     Defendant Adams became infuriated and reminded Plaintiff, "you are a subordinate!"

45.     A few days later, in or about the last week of June, Defendant Adams continued belittling Plaintiff by telling Plaintiff's colleagues that she was his "secretary" and not the Community Coordinator.  In response to Defendant Adams' efforts to humiliate Plaintiff, Officer Tyrone Bryant (Defendant Adams' nephew), Detective Suk Too, Detective Wyman Chin, Lieutenant Frank Jurhs ("Lt. Jurhs") and Detective Specialist Jarrin L. Barksdale, all laughed at Plaintiff and questioned Plaintiff's position.

46.     On or about July 3, 2022, Plaintiff had a meeting scheduled with Deputy Inspector Jeremy Scheublin ("Mr. Scheublin") to discuss logistics for the upcoming "Community Day" event.

47.     After Defendant Adams somehow found out about Plaintiff's meeting with Mr. Scheublin, he insisted on attending and traveling in the same car as Plaintiff.

48.     Plaintiff panicked at the idea of being in a car with Defendant Adams and falsely told him the meeting was canceled.

49.     A few days later, Plaintiff ultimately met with Mr. Scheublin to plan the Community Day event. Defendant Adams later learned of Plaintiff's meeting with Mr. Scheublin and became irate.

50.  Plaintiff explained to Defendant Adams that she had done nothing wrong as he was aware, verbally and in writing, of Plaintiff's involvement the Community Day planning, as well as the various meetings Plaintiff needed to hold to plan the event.

51.  On July 8, 2022, as well July 11, 2022, July 12, 2022 and July 13, 2022, Plaintiff emailed Chief Maximo Tolentino ("Chief Tolentino"), and various other relevant parties, to notify them of the addition to Community Day budget brought on by Emblem Health's donation of $1,500.00. Chief Tolentino and the Police Foundation replied to Plaintiff's email, giving her permission to use the corporate American Express credit card to make additional purchases for the event.

52.  On or about July 13, 2022, Defendants hosted the Community Day Event with the 52nd Precinct. Plaintiff organized and coordinated the successful event. Detective Sanchez (first name unknown) ("Detective Sanchez") and Officer Moussanef assisted Plaintiff setting up the event.

53.  During the event, Officer Moussanef, Detective Sanchez, Chief Tolentino, Mr. Scheublin, Darney Rivers ("Mr. Rivers"), and Plaintiff, all received Citation Awards from the Public Advocate Office.

54.  After the award ceremony, Defendant Adams – in an effort to retaliate against Plaintiff – called the Investigative Community Officer for the Community Affairs Bureau Investigative Unit (colloquially known as the "ICO") and accused Plaintiff of theft.

55.  Shortly thereafter, Lieutenant Fernandez (first name unknown) ("Lt. Fernandez") and Sargent Monegro ("Sgt. Monegro") approached Officer Moussanef and Detective Sanchez to question them regarding Plaintiff's alleged theft.

56.  The following day, on or about July 14, 2022, Plaintiff was called into Defendant Adams'

office. While in the office, Defendant Adams and Lt. Jurhs questioned Plaintiff regarding her use of the corporate credit card.

57.    Plaintiff explained that the applicable paperwork was submitted to Chief Tolentino's office for his signature and Chief Tolentino personally approved Plaintiff's use of the credit card.

58.    Defendant Adams then called Plaintiff a thief and Lt. Jurhs walked around the office loudly accusing Plaintiff of stealing money.

59.    On or about July 14, 2022, Plaintiff contacted Anthony Herbert ("Mr. Herbert"), Community Advocate from the Mayor's Community Affairs Unit, and informed Mr. Herbert of what was occurring in the office, i.e., the sexual harassment and subsequent retaliation by Defendant Adams. However, Plaintiff was unaware that Defendant Adams' had already called Mr. Herbert and made various false and disparaging remarks regarding Plaintiff.

60.    In response, Mr. Herbert advised Plaintiff to file a complaint with the EEO.

61.    On or about July 15, 2022, Defendant Adams emailed Plaintiff, Sgt. Monegro, and Chief Tolentino, asking Plaintiff to schedule a "clarification meeting." Plaintiff replied asking, "am I being disciplined?" Plaintiff received no response.

62.    Plaintiff called her Union Representative (name unknown) ("Union Representative") and reported the on-going incidents of sexual harassment, discrimination, and retaliation. Thereafter, the Union Representative contacted Defendant Adams and demanded that he suspend his efforts to schedule a "clarification meeting" because Plaintiff, a civilian, required representation at the meeting. Defendant Adams ultimately postponed the meeting.

63.    On or about July 18, 2022, Defendant Adams sent another email to Plaintiff to schedule a clarification meeting, but this time scheduled it as a one-to-one meeting to occur in the conference room. However, Plaintiff was not informed that Inspector Victoria Perry ("Ms.

Perry") would also be in attendance. Further, Plaintiff was not allowed Union representation during this clarification meeting and was told by Defendant Adams that she would face discipline if she sought Union representation.

64.    During the meeting, Defendant Adams once more accused Plaintiff of theft. Plaintiff informed him that she had documentation proving that she was authorized to make the purchases, which were the subject of the purported theft. Failing to meaningfully address Plaintiff's response, Defendant Adams instead became upset that Plaintiff was not referring to him as "Director Adams" and referred to himself as the "One Star."

65.    On or about July 21, 2022, Plaintiff asked Defendant Adams for a written description of Plaintiff's job duties. Defendant Adams forwarded the job description from the Community Ambassador Task & Standards webpage.

66.    Plaintiff forwarded this description to her Union Representative, who explained that Plaintiff was performing the duties of a Community Ambassador but was being paid less than half of the appropriate salary. As such, Plaintiff advised Defendant Adams of the salary discrepancy and noted that the tasks she performed were the same as those of a Community Ambassador.

67.    On or about July 22, 2022, Plaintiff filed a formal complaint with the EEO regarding Defendant Adam's harassment, discrimination, and retaliation.

68.    Three days later, on or about July 25, 2022, Plaintiff noticed she was removed from the CAB calendar, upon information and belief, in retaliation for lodging her EEO complaint.

69.    Plaintiff emailed Defendant Adams to inquire as to why she was removed from the calendar. Defendant Adams replied aggressively, claiming none of Plaintiff's events were approved.

70.    However, Plaintiff was aware that the Deputy Commissioner, Mr. Stewart, had previously approved at least one of the scheduled events, the Senior Citizen Health Fair.

71.    Notwithstanding the approval by Mr. Stewart, Defendant Adams refused to send officers to support the Senior Citizen Health Fair, which was common practice for other events.

72.    In or about the first week of August 2022, Defendant Adams was placed in a different division at 1 Police Plaza until Plaintiff's EEO investigation was concluded. Plaintiff did not in any way request Defendant Adams' new placement; indeed, upon information and belief, Chief Tolentino, Chief Jeffrey Maddrey, Deputy Commissioner Mark Stewart and others made this decision.

73.    On or about August 16, 2022, Officer Moussanef was ordered to testify as a witness to Plaintiff's EEO complaint.

74.    Upon information and belief, just one day after his testimony, on or about August 17, 2022, Officer Moussanef was transferred out of the office.

75.    The next days, on or around August 18, 2022, at a community affairs meeting attended by several employees, Chief Tolentino addressed everyone in attendance by stating: "I do want to make one last statement and that is the following: business of community affairs, is the business of community affairs.  You should not be discussing what happens in here with anyone else. There is no reason to air out dirty laundry out to rest of the world."

76.    Upon information and belief, Chief Tolentino was specifically referring to Plaintiff's EEO complaint against Defendant Adams, which Plaintiff had first brought to Commissioner Caban.

77.    Upon information and belief, Chief Tolentino made these statements at the behest of Commissioner Caban to further remove Caban from becoming involved and to distract from Commissioner Caban's failure to escalate or investigate Plaintiff's complaint.

78.    Chief Tolentino also made these statements to deter and dissuade other employees from

lodging complaints or engaging in protected activity.

79.    On or about August 22, 2022, Ms. Perry came into the office and ordered everyone to pack up their belongings and to prepare to sit in new seats. Ms. Perry then claimed that the Admin and Operations team would be created within the Community Affairs Bureau.

80.    Ms. Perry told Plaintiff that she would be given the title of Event Coordinator. Plaintiff asked for an email outlining Plaintiff's new position, a job description, and any other changes. Plaintiff never received any such email.

81.    After the desk assignments were distributed, Plaintiff was the only employee left without a desk. Plaintiff asked Ms. Perry, and Ms. Perry replied, "you don't need a desk" and told Plaintiff to "work outside."

82.    As such, in the days that followed Plaintiff was forced to search for new work locations on a daily basis as Defendant refused to provide Plaintiff a workstation. Plaintiff was ultimately able to find a work location at the 41st Precinct.

83.    On or about September 6, 2022, Defendant Adams returned to the office.

84.    On or about September 18, 2022, Plaintiff worked on the African American Parade, which was approved by Chief Tolentino.

85.    Due to the extensive work required, Plaintiff requested overtime to complete her tasks. Plaintiff's overtime requests were quickly rejected without cause or explanation.

86.    On or about September 20, 2022, Sgt Monegro and Lt. Fernandez ordered Plaintiff to appear for a hearing at 34 East 12th Street, scheduled for September 29, 2022. Sgt. Monegro and Lt. Fernandez claimed the hearing was a "follow up to the EEO complaint that was filed."

87.    On or about September 20, 2022, Plaintiff filed an official complaint with the Internal Affairs Bureau regarding Defendant Adams' sexual harassment, discrimination, and retaliation.

Plaintiff further complained of retaliation from Lt. Jurhs, Sgt. Monegro, Lt. Fernandez, among others.

88.    On or about October 3, 2022, Defendant Adams sent Plaintiff an email claiming his supervisory duties had been restored and revoked Plaintiff's permission to work at the 41st Precinct. He informed Plaintiff that she was ordered to work at 1932 Arthur Avenue Station, reporting to Sergeant Robin Peralta. Plaintiff immediately contacted one of her Union representatives, Cheryl Williamson, to advise her of this sudden change.

89.    Plaintiff asked Defendant Adams why she was being moved out of Community Affairs and placed in the Outreach Department. Defendant Adams ignored Plaintiff's question, and instead sent Plaintiff an email outlining Plaintiff's new job duties and instructed Plaintiff to appear at 1 Police Plaza by 2:00 P.M.

90.    Defendant Adams further modified Plaintiff's work schedule, without cause or explanation, from 9:00 A.M. to 5:00 P.M. to 9:30 A.M. to 5:30 P.M.

91.    Defendant Adams was aware that this change in schedule would work significantly to Plaintiff's detriment because he knew that Plaintiff is a single mother and solely responsible for picking up her child after school.

92.    On or about October 4, 2022, Plaintiff appeared, as ordered, at her new work location at 1932 Arthur Avenue in the Bronx, New York.

93.    Upon entering the new location Plaintiff suffered a panic attack. Around the same time, Plaintiff received a call from Captain Anthony Mascia ("Captain Mascia") of the 41st Precinct, asking where Plaintiff was.

94.    Plaintiff informed Captain Mascia of Defendant Adams' orders regarding her new work location. Captain Mascia, noticing Plaintiff's angst and emotional distress, sent an ICO

Lieutenant from the 41st Precinct to pick Plaintiff up from the Arthur Avenue Precinct.

95.   Shortly thereafter, Lieutenant Erin McMorrow picked Plaintiff up and drove Plaintiff to the NYPD therapist for an evaluation. Plaintiff suffered another panic attack while informing the Therapist of the ongoing harassment, discrimination, and retaliation.

96.   In the days that followed, as ordered by her treating physician, Plaintiff took unpaid time off to address her anxiety and depression and to begin therapy.

97.   On or about October 8, 2022, Plaintiff received a phone call from a colleague who informed her that Lieutenant Joseph Abdelmessiah ("Lt. Abdelmessiah"), in an "open conversation," with Deputy Inspectors referred to Plaintiff as "a troublemaker and an EEO dropper." Lt. Abdelmessiah further told the officers to not work with Plaintiff.

98.   On or about October 11, 2022, Plaintiff returned to work at the Arthur Avenue location.

99.   That same day, Plaintiff was summoned again by two ICO investigators for a hearing regarding a complaint made against her. Prior to this, Plaintiff was not aware of this complaint against her.

100.  On or about October 17, 2022, Plaintiff attended the hearing with Local Union 371 Union Representative Ms. Williams (first name unknown) ("Ms. Williams"). Ms. Williams informed Plaintiff that Plaintiff was the subject of a complaint, and that Lt. Jurhs had filed a frivolous complaint against Plaintiff.

101.  On October 18, 2022, Plaintiff spoke, over the phone, with David Johnson, a member of the Mayor's security detail about Defendant Adams' harassment.

102.  On or about October 25, 2022, Plaintiff received confirmation that Lt. Jurhs' allegations were found "unsubstantiated."

103.  On or about November 28, 2022, Plaintiff reported to a meeting with Inspector Paul Rasa.

Upon information and belief, Inspector Rasa is good friends with Defendant Adams.

104. Plaintiff was under the belief that the meeting with Inspector Rasa was scheduled to discuss Plaintiff's new "tasks and standards" in light of her involuntary transfer to the Arthur Avenue location.

105. Notably, prior to this meeting, Plaintiff heard rumors that in her new work location, she would effectively be demoted to working in Defendant NYC's Outreach division, where she would continue being paid less than half of the appropriate salary for Community Ambassadors, despite performing the duties of the Community Ambassador position.

106. However, when she walked into the meeting, Plaintiff Inspector Rasa instructed her to surrender her work ID and company issued phone.

107. Plaintiff's employment with Defendant NYC was formally terminated on November 28, 2022. Upon information and belief, Defendant NYC terminated Plaintiff solely in retaliation for her complaints of harassment and retaliation by Defendant Adams as well as others employed by Defendant NYC.

108. On or around November 25, 2022, Plaintiff received her paystub for the pay period of November 6, 2022 through November 19, 2022. Plaintiff was not compensated for the week prior to Plaintiff's termination.

109. Thereafter, on December 12, 2022, Defendant NYC, by and through the NYPD, issued a document entitled "Personnel Order No. 311," which, upon information and belief, was distributed to all NYPD employees and other employees of Defendant NYC and listed Plaintiff's name under a section entitled "Services Terminated."

110. By needlessly broadcasting her termination citywide via Personnel Order No. 311, Defendants caused Plaintiff even further humiliation and distress.

111. On or around December 13, 2022, despite Plaintiff's termination, Plaintiff planned the Winter Wonderland Event, which proved to be successful in sponsorships. Defendant NYC claimed responsibility for the event's success.

112. As a result of Defendant's actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, traumatized and emotionally distressed.

113. As a result of Defendant's actions, Plaintiff has suffered panic attacks, resurfaced trauma of a previous sexual assault, grief, depression, severe anxiety, and strained relationships.

114. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff further experienced severe emotional and physical distress.

**FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER TITLE VII**
**(Against Defendant NYC Only)**

115. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

116. 42 U.S.C. § 2000e-2(a)(1), states in part:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

117. As described herein, Defendant, through its employees, engaged in unlawful employment practices prohibited by Title VII, by discriminating against Plaintiff on the basis of her sex and gender (female) by creating, fostering, condoning, accepting, ratifying, and/or negligently

16

failing to prevent or remedy a hostile work environment that included, among other things, discriminatory and disparate treatment of Plaintiff by way of sexual harassment.

118.    Defendant, through its employee Defendant Adams, engaged in a pattern of ongoing severe and pervasive sexual harassment against Plaintiff as described herein.

119.    As a result of Defendant's unlawful discriminatory conduct in violation of the Title VII, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

120.    As a result of the unlawful discriminatory conduct of the Defendant in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

121.    The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

**SECOND CAUSE OF ACTION**
**FOR RETALIATION UNDER TITLE VII**
**(Against Defendant NYC Only)**

122.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

123.    42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> [T]o . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or

hearing under this subchapter.

124. As described herein, Plaintiff engaged in protected activities by objecting to Defendant Adams' severe and pervasive sexual harassment, and by filing a formal complaint against Defendants for sexual harassment, discrimination, and retaliation.

125. Then, merely days after Plaintiff rejected Defendant Adams and objected to Defendant Adams' sexual harassment, Defendant retaliated against Plaintiff as described herein.

126. Defendant would not have retaliated against Plaintiff but for Plaintiff's objections to the sexual harassment and hostile work environment.

127. Such retaliatory treatment would dissuade any reasonable employee from making or supporting a similar complaint of discrimination.

128. As a result of Defendant's unlawful conduct in violation of the Title VII, Plaintiff has suffered, and continues to suffer, economic loss, for which Plaintiff is entitled to an award of monetary damages and other relief.

129. As a result of the unlawful conduct of Defendant in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

130. The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

### THIRD CAUSE OF ACTION
### FOR DISCRIMINATION UNDER THE NYSHRL
### (Against All Defendants)

131. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully

set forth herein.

132.   New York State Executive Law §296(1)(a) provides that

>      It shall be an unlawful discriminatory practice: For an employer or
>      licensing agency, because of an individual's age, race, creed, color,
>      national origin, sexual orientation, military status, **sex**, disability,
>      predisposing genetic characteristics, marital status, or domestic
>      violence victim status, to refuse to hire or employ or to bar or to
>      discharge from employment such individual or to discriminate
>      against such individual in compensation or in terms, conditions or
>      privileges of employment.

(emphasis added).

133.   Under New York State law, sexual harassment does not need to be "severe or pervasive"

before it is unlawful. A single incident can be sufficient. Harassment is unlawful if it is

anything more than what a "reasonable victim of discrimination would consider petty slights

or trivial inconveniences."

134.   As described above, Defendants; actions and harassment went far beyond "petty slights or

trivial inconveniences." As described herein, Defendants engaged in unlawful employment

practices prohibited by NYSHRL, by discriminating against Plaintiff on the basis of her sex

and gender (female) by creating, fostering, condoning, accepting, ratifying, and/or negligently

failing to prevent or remedy a hostile work environment that included, among other things,

discriminatory and disparate treatment of Plaintiff by way of sexual harassment.

135.   As a result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL,

Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an

award of monetary damages and other relief.

136.   As a result of the unlawful discriminatory conduct of the Defendants in violation of NYSHRL,

Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress,

including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss

of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

137. The unlawful discriminatory actions of Defendants constitute malicious, willful, and wanton violations of NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**FOR RETALIATION UNDER THE NYSHRL**
**(Against All Defendants)**

138. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

139. Executive Law § 296 provides that:

> It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article.

140. As described herein, Plaintiff engaged in protected activities by objecting to Defendant Adams' severe and pervasive sexual harassment, and by filing a formal complaint against Defendants for sexual harassment, discrimination, and retaliation.

141. Then, merely days after Plaintiff rejected Defendant Adams and objected to Defendant Adams' sexual harassment, Defendants retaliated against Plaintiff as described herein.

142. Defendants would not have retaliated against Plaintiff but for Plaintiff's objections to the sexual harassment and hostile work environment.

143. Such retaliatory treatment would dissuade any reasonable employee from making or supporting a similar complaint of discrimination.

144. As a result of Defendants' unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which Plaintiff is entitled to an award of

monetary damages and other relief.

145.    As a result of the unlawful conduct of the Defendants in violation of NYSHRL, Plaintiff has

suffered, and continues to suffer, severe mental anguish and emotional distress, including, but

not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem

and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an

award of monetary damages and other relief.

146.    The unlawful discriminatory actions of Defendants constitute malicious, willful, and wanton

violations of NYSHRL, for which Plaintiff is entitled to the maximum allowable damages

under this statute and an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER THE NYCHRL**
**(Against All Defendants)**

147.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully

set forth herein.

148.    New York City Administrative Code §8-107(1) provides that it shall be an unlawful

discriminatory practice:

> For an employer or an employee or agent thereof, because of the
> actual or perceived age, race, creed, color, national origin, gender,
> disability, marital status, sexual orientation or alienage or
> citizenship status of any person, to refuse to hire or employ or to bar
> or to discharge from employment such person or to discriminate
> against such person in compensation or in terms, conditions, or
> privileges of employment.

149.    Under New York City law, sexual harassment does not need to be "severe or pervasive" before

it is unlawful. A single incident can be sufficient. Harassment is unlawful if it is anything

more than what a "reasonable victim of discrimination would consider petty slights or trivial

inconveniences."

21

150.  As described above, Defendants' actions and harassment went far beyond "petty slights or trivial inconveniences." As described herein, Defendants engaged in unlawful employment practices prohibited by NYCHRL, by discriminating against Plaintiff on the basis of her sex and gender (female) by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, discriminatory and disparate treatment of Plaintiff by way of sexual harassment.

151.  As a result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

152.  As a result of the unlawful discriminatory conduct of the Defendants in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

153.  The unlawful discriminatory actions of Defendants constitute malicious, willful, and wanton violations of NYCHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## SIXTH CAUSE OF ACTION
## FOR RETALIATION UNDER THE NYCHRL
### (Against All Defendants)

154.  Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

155.  The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such

person has opposed any practices forbidden under this chapter…"

156.    As described herein, Plaintiff engaged in protected activities by objecting to Defendant Adams' severe and pervasive sexual harassment, and by filing a formal complaint against Defendants for sexual harassment, discrimination, and retaliation.

157.    Then, merely days after Plaintiff rejected Defendant Adams and objected to Defendant Adams' sexual harassment, Defendants retaliated against Plaintiff as described herein.

158.    Defendants would not have retaliated against Plaintiff but for Plaintiff's objections to the sexual harassment and hostile work environment.

159.    Such retaliatory treatment would dissuade any reasonable employee from making or supporting a similar complaint of discrimination.

160.    As a result of Defendants' unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which Plaintiff is entitled to an award of monetary damages and other relief.

161.    As a result of the unlawful conduct of Defendants in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

162.    The unlawful discriminatory actions of Defendants constitute malicious, willful, and wanton violations of NYCHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## **JURY DEMAND**

163.    Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII, NYSHRL, and NYCHRL in that Defendants discriminated against and retaliated against Plaintiff on the basis of sex by way of sexual harassment and created and maintained a hostile work environment;

B.    Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful discrimination and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.    Awarding Plaintiff compensatory damages for mental, emotional injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.    Awarding Plaintiff punitive damages;

E.    Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action; and

F.    Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendant's unlawful employment practices.

Dated: Garden City, New York
       January 9, 2024

                                        **PHILLIPS & ASSOCIATES,**
                                        **ATTORNEYS AT LAW, PLLC**

                              By:    _____/s/_____
                                        Joshua M. Friedman, Esq.
                                        585 Stewart Avenue, Suite 410
                                        Garden City, New York 11530
                                        T: (212) 248-7431
                                        F: (212) 901-2107